## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

DAVID ZANOR,                                        Civ. No. 08-4584 (DSD/FLN)

       Plaintiff,

v.                                        **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

_____

     Defendant has denied Plaintiff David Zanor's application for supplemental security

income (SSI) under the Social Security Act, 42 U.S.C. § 1381a.  Plaintiff filed a complaint

seeking review of the denial of benefits on July 8, 2008.  The action is now before the Court on

cross-motions for summary judgment.  Plaintiff is represented by Shelley D. Jensen, Esq.

Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.  This Court has

jurisdiction over the matter pursuant to 42 U.S.C. § 1383(c)(3), and 42 U.S.C. § 405(g).  It is

properly before the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Local

Rule 72.1.  For the reasons stated below it is recommended that Plaintiff's motion for summary

judgment be denied [Docket Nos. 9-14]; and Defendant's motion for summary judgment be

granted [Docket No. 17].

## I.    PLAINTIFF'S BACKGROUND

     Plaintiff David Zanor was forty-four-years-old when he filed his application for SSI.  (Tr.

23.)  He has a high school education, and work experience as a siding installer and handyman.

(Tr. 73, 435.)  Plaintiff lives with his mother and his son.  (Tr. 435).  He has chronic back pain, and had back surgery on May 9, 2005.  (Tr. 119-23.)

## II.      PROCEDURAL BACKGROUND

### A.      <u>Administrative Process</u>

Plaintiff filed his application for SSI on June 21, 2005.  (Tr. 67.)  The application was denied initially and upon reconsideration.  (Tr. 48-51, 53-57.)  Plaintiff requested a hearing, and a hearing was held before Administrative Law Judge Michael D. Quayle on October 4, 2007.  (Tr. 432)  On December 28, 2007, the ALJ issued an unfavorable decision.  (Tr. 15-25.)  The Social Security Administration Appeals Council denied Plaintiff's request for further review.  (Tr. 5-7.)  The denial of review made the ALJ's findings the final decision of the defendant.  42 U.S.C. § 405(g); <u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir. 1992).  Plaintiff seeks review of the denial of benefits pursuant to 42 U.S.C. § 405(g).

### B.      <u>Medical Records</u>

Plaintiff's chronic back pain predates his alleged onset date of September 2004.  On January 28, 2003, Plaintiff went to a new clinic and reported that he had eight ruptured disks in his back, and that he exacerbated his chronic back pain while doing some roofing.  (Tr. 318.)  He was prescribed Vicodin, but was advised that the clinic would not prescribe chronic pain medication.  (<u>Id.</u>)  Plaintiff was later prescribed Methadone and Soma at a chronic pain clinic.  (Tr. 317.)  Plaintiff needed refills of his pain medication to be able to work as a roofer.  (Tr. 315.)       Plaintiff fell on some ice and hurt his back in December 2004.  (Tr. 140.)  In a neurology consultation at the Fairview University Medical Center, Dr. John Tulloch noted that Plaintiff's case was complicated by being a chronic user of prescribed painkillers, and by a

twenty-five-year history of heavy marijuana use.  (Tr. 140-41.)  Neurologically, Plaintiff

complained that pain impaired his balance, and disrupted his sleep.  (Id.)  An MRI of Plaintiff's

lumbar spine indicated degenerative changes with areas of spinal canal and neural foraminal

narrowing, and questionable nerve root impingement on the exiting left L5 nerve root.  (Tr. 144.)

Plaintiff was prescribed Vicodin and Soma.  (Tr. 142.)

Plaintiff underwent a neurosurgical consultation with Dr. Andrew Freese on January 6,

2005.  (Tr. 137-38.)  He complained of severely incapacitating left leg pain.  (Tr. 137.)  On

physical examination, Plaintiff appeared to be in moderate to severe distress.  (Tr. 138.)  He had

limited range of motion in the lumbar region, and pain with palpation.  (Id.)  Dr. Freese noted

extensive degenerative changes on the MRI of Plaintiff's lumbar spine, with an L3-4 disc

herniation clearly causing nerve root compression.  (Tr. 138.)  Dr. Freese was reluctant to do

surgery because it would require decompression, fixation, and fusion.  (Id.)  Instead, he

recommended a selective nerve block at L3-4.  (Id.)

On May 4, 2005, Plaintiff underwent laminectomy and fusion surgery because

conservative measures had not relieved his back pain.  (Tr. 297-98.)  Dr. Freese saw Plaintiff in

postoperative follow-up in August 2005.  (Tr. 169.)  An x-ray of the lumbar spine showed

evidence of a slowly developing fusion, and good position of hardware.  (Id.)  Dr. Freese opined

that Plaintiff benefitted from the surgery, and was far more ambulatory than before surgery.  (Id.)

However, he noted that physical therapy had increased Plaintiff's pain, and Plaintiff was still

using ibuprofen, Flexeril, and Percocet.  (Id.)  Dr. Freese could not provide Plaintiff with long-

term narcotic medications, so he recommended a pain management program.  (Id.)

Dr. Freese referred Plaintiff to Dr. Marie Leisz for rehabilitation consultation in October

2005.  (Tr. 164-67.)  Plaintiff complained that his pain was not alleviated by narcotic

medications.  (Tr. 164.)  Dr. Leisz noted that after surgery, Plaintiff discharged himself against

medical advice because he was unhappy about the recommendations written about his pain

medication.  (Id.)  She noted that Plaintiff's leg pain had completely resolved at a clinic visit on

May 12, 2005, but he complained of incisional pain.  (Tr. 165.)  Plaintiff tried pool therapy in

July 2005, but it exacerbated his pain, and he increased his use of Percocet.  (Id.)

        Plaintiff reported to Dr. Leisz that he had numbness over the right thigh, and aching in

the back of the legs.  (Id.)  He also reported that being in any prolonged position increased his

pain, and lying down and taking medication helped his pain.  (Id.)  Upon examination, Dr. Leisz

diagnosed diffuse spinal arthritis status post lumbar fusion with residual low back pain, muscle

disuse atrophy and deconditioning.  (Tr. 166.)  Dr. Leisz opined that Plaintiff's lack of a normal

level of activities of daily living since December 2004 contributed to persistence of his

symptoms.  (Id.)  She recommended that Plaintiff begin therapy with a myofascial therapist, but

she noted that the therapy may not completely relieve his symptoms because he had diffuse

spinal arthritis for such a long time.  (Id.)  Dr. Leisz informed Plaintiff that she expected him to

wean from pain medications, if therapy improved his symptoms.  (Id.)  She recommended

vocational rehabilitation because Plaintiff could not pursue heavy labor due to his degree of

spinal arthritis.  (Tr. 167.)

        Plaintiff was evaluated for physical therapy on October 31, 2005.  (Tr. 227-28.)  Physical

Therapist Nancy Droege noted that Plaintiff could not put on his shoes or socks independently.

(Tr. 227.)  His sitting tolerance was one hour, walking tolerance was ten minutes, and standing

tolerance was thirty minutes.  (Id.)  On examination, Plaintiff was noted to be quite

4

deconditioned.  (Id.)  He was scheduled for twelve visits of physical therapy at Physical Therapy

Orthopaedic Specialists, Inc.  (Tr. 228.)

Plaintiff saw Dr. Freese in January 2006, and reported that he still had pain all of the

time, but was somewhat better.  (Tr. 361.)  Plaintiff felt that the addition of Percocet and

Lidoderm patches was relieving some of his pain.  (Id.)  Over the holidays, Plaintiff shopped

several times, cooked, traveled, and was on his feet a lot.  (Id.)  He was able to don his socks

without assistance most of the time.  (Id.)  Amitriptyline was helping him sleep, but was not

decreasing his pain.  (Id.)

Plaintiff told Dr. Freese that he met with a job counselor, who agreed that he would need

to continue physical therapy and be able to sit for four hours before he could begin retraining.

(Id.)  Plaintiff reported he could sit for thirty minutes before needing to change his position.  (Id.)

Dr. Freese recommended a permanent restriction for Plaintiff to avoid snow shoveling.  (Tr.

362.)  He also wrote a prescription to continue Plaintiff's physical therapy, with the goal of

achieving a sitting tolerance of four hours.  (Id.)  However, Dr. Freese warned that Plaintiff may

never be able to sit more than thirty minutes before he needs to change position.  (Id.)

In February, Plaintiff continued to improve with physical therapy.  (Tr. 358.)  He could

sit for an hour, and relieve his back pain by getting up to walk.  (Id.)  However, Plaintiff reported

that his pain was still relatively constant, but varying in intensity.  (Id.)  Plaintiff also reported

some increased radicular pain, and Dr. Leisz prescribed Neurontin.  (Tr. 359.)

Plaintiff had a flare of his back and leg pain in March.  (Tr. 356.)  He had recently

increased his walking from a quarter mile to a half mile.  (Id.)  He was also busy with

appointments for himself, and his son.  (Id.)  Dr. Leisz opined that Plaintiff had unintentionally

overdone his activities.  (Id.)  She recommended that he go back to walking a quarter mile, and

attend physical therapy throughout March.  (Id.)  Plaintiff felt frustrated, and depressed about his

slow progress.  (Tr. 357.)  Dr. Leisz suggested that he consider taking an antidepressant.  (Id.)

Dr. Freese ordered a CT scan of Plaintiff's lumbar spine.  (Tr. 353.)  The CT scan

indicated mild to moderate right and moderate left bony foraminal stenosis at L5-S1; mild

bilateral bony foraminal stenosis at L4-L5; moderate central stenosis and mild bilateral foraminal

stenosis at L2-L3.  (Tr. 255, 351-52.)  There appeared to be a solid bony fusion at L3-L4.  (Id.)

At the end of March, Plaintiff fell on some ice and suffered excruciating pain, which

extended into his legs with tingling and numbness.  (Tr. 349.)  Plaintiff had another CT scan, and

it did not indicate a structural explanation for Plaintiff's symptoms.  (Id.)  Dr. Freese noted that

Plaintiff was clearly uncomfortable, and opined that his pain was related to muscle, ligaments,

and tendons, rather than nerve root compression   (Id.)

Dr. Leisz then referred Plaintiff to Dr. Mark Stuckey for pain management consultation.

(Tr. 346, 399.)  She noted that she doubled Plaintiff's dose of Oxycodone after he fell on the ice

in March.  (Tr. 347, 400.)  She hoped Dr. Stuckey would have recommendations to help decrease

Plaintiff's pain so he could meet his goal of returning to work at a sedentary job.  (Id.)  Upon

examination, Dr. Stuckey opined that Plaintiff was still suffering from spinal stenosis.  (Tr. 345.)

He continued Plaintiff on Oxycontin every eight hours.  (Id.)  Plaintiff stated that he felt about

30% better on this medication regimen.  (Tr. 388.)

An x-ray of Plaintiff's spine was taken on May 3, 2006, due to his complaints of

excruciating mid-thoracic pain.  (Tr. 251.)  The impression from the x-ray was of stable posterior

spinal fusion from L3 through S1.  (Id.)

Plaintiff was treated for low blood pressure and dizzy spells on June 6, 2006.  (Tr. 290.)

Plaintiff felt the dizzy spells were related to an increase in his pain medication a month ago.

(Id.)  Two weeks later, Plaintiff's dizziness had improved.  (Tr. 289.)  In early July, Plaintiff

reported being able to do more activities.  (Tr. 386.)  Dr. Leisz encouraged Plaintiff to look for a

job.  (Tr. 387.)

In July 2006, Plaintiff was treated for acute opiate withdrawal when he was unable to

tolerate oral medications after having oral surgery.  (Tr. 300.)  Plaintiff had been chronically on

Oxycontin two or three times a day.  (Id.)  He was discharged after showing considerable

improvement from treatment with Zofran, morphine, and Ativan.  (Tr. 300-01.)

Plaintiff went to the emergency room with symptoms consistent with opiate withdrawal

again on July 28, although he had restarted his usual narcotic regimen.  (Tr. 288.)  He was

improved on August 8, but Plaintiff said he had not felt quite normal since his hospital visit for

opiate withdrawal.  (Tr. 286.)

Plaintiff underwent a psychological evaluation with Dr. Angela Folie at the Central

Center for Family Resources on October 12, 2006.  (Tr. 414-18.)  Plaintiff was given a variety of

tests, and Dr. Folie opined that the test results appeared to be a valid representation of Plaintiff's

current functioning.  (Tr. 414.)  Plaintiff performed in the average range on the WASI test, a

short form of the Wechsler Intelligence Scales.  (Tr. 416.)  On a test of social and emotional

functioning and behavior, Plaintiff's response style indicated a person who is overly reactive to

the attitudes and demands of others, feels victimized by society, and expects disappointment in

life.  (Tr. 417.)  Plaintiff's score on the Beck Depression Inventory suggested moderate

depressive symptoms.  (Id.)  Dr. Folie diagnosed pain disorder associated with both

psychological factors and a general medical condition, recurrent and moderate major depressive disorder, and she assigned a GAF score of 55.[1]  (Tr. 418.)

Plaintiff saw Dr. Stuckey in November 2006, and reported continued back and leg pain, which was best relieved by lying flat.  (Tr. 375.)  He was able to perform most of his activities of daily living, but that was all he could do.  (Id.)  Dr. Stuckey increased Plaintiff's dose of Oxycontin.  (Tr. 376.)

In December 2006, Plaintiff's physical therapist noted that Plaintiff was fatigued and suffered increased pain because he had been doing a lot of car travel, caring for his son who was ill, doing laundry, and grocery shopping.  (Tr. 412.)  However, she noted that Plaintiff was much more tolerant of activity in physical therapy.  (Id.)

In January 2007, Plaintiff reported that he could sit for fifteen to thirty minutes, and do household chores for two hours before he had to lie down for an hour or two.  (Tr. 373.)  Plaintiff felt he was at a plateau.  (Id.)  Dr. Stuckey increased Plaintiff's Oxycontin, and recommended that he switch from land-based physical therapy to aquatic-based therapy.  (Tr. 374.)  He noted that Plaintiff appeared somewhat depressed and frustrated.  (Id.)

Plaintiff was evaluated for depression at Family Life Center on March 8, 2007.  (Tr. 342.) He reported depression from not being able to do much.  (Tr. 343.)  His symptoms were wanting to do nothing but sleep, frustration, irritability, very low motivation, crying spells, and social withdrawal.  (Id.)  The evaluator, Dr. Steven Smith, opined that Plaintiff appeared depressed and

---

[1]        A Global Assessment of Functioning "GAF" score of 51-60 indicates moderate symptoms.  A GAF score of 41-50 indicates serious symptoms affecting social, occupational, or school functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders Fourth Edition Text Revision 34 (2000)(DSM-IV-TR).

irritable.  (Tr. 343-44.)  Dr. Smith diagnosed major depressive disorder with a GAF score of 44.

(Tr. 343.)  Dr. Smith opined:

> [Plaintiff] appears to be experiencing severe depression
> exacerbated by his physical, housing and financial difficulties.  He
> seems to lack skills for coping better with his situation.  At some
> level, his difficulties appear to be artifacts of his choices and
> personality organization [rather] than a biological condition.

(Tr. 344.)  Dr. Smith recommended psychotherapy.  (Id.)  Later that month, Dr. Smith worked on

developing a therapeutic relationship with Plaintiff, who felt overwhelmed by stress in his life.

(Tr. 341.)  Plaintiff was feeling a little more hopeful when he saw Dr. Smith in April.  (Tr. 339.)

Dr. Smith increased Plaintiff's GAF score to 46.  (Id.)

Plaintiff underwent an initial psychiatric evaluation at Family Life Center with Dr. James

McCoy on April 25, 2007.  (Tr. 331.)  Plaintiff reported that his main stressor was dealing with

his twelve-year-old son.  (Id.)  Plaintiff was taking Celexa, which was prescribed by his family

doctor.  (Id.)  Plaintiff reported that when he was young, he experimented with alcohol and

marijuana, but this had not been a problem for some time.  (Tr. 332.)  Dr. McCoy opined that

Plaintiff appeared to have some discomfort from his back, his mood was dysphoric, and his

affect was sad and tearful.  (Id.)  He also noted that Plaintiff had some trouble with

concentration, and his impulse control was slightly impaired.  (Id.)  Dr. McCoy diagnosed major

depressive disorder, moderate to severe, with a GAF score of 45-50.  (Id.)  Dr. McCoy

discontinued Celexa, and started Plaintiff on Cymbalta, which he increased the next month.  (Tr.

330, 332.)  When that was not effective, Wellbutrin was added.  (Tr. 329.)

In May, Plaintiff reported improvement in his mood, and being more active.  (Tr. 337.)

However, several weeks later Plaintiff was feeling overwhelmed and having difficulty dealing

with his son.  (Tr. 336.)

On his thirty-ninth visit to physical therapy on May 15, 2007, Plaintiff's physical therapist noted that he was "finally making consistent gains."  (Tr. 250.)  The next month, Plaintiff was treated for dizziness, fatigue, shaking and sweating.  (Tr. 282.)  Plaintiff was diagnosed with dizziness and giddiness, most likely secondary to acute illness.  (Tr. 284.) He was treated with Vistaril, and he visibly improved.  (Id.)  Plaintiff returned in July and reported that his dizziness improved when he stopped his blood pressure medication.  (Tr. 281.) However, in August he reported recurrent dizziness with near syncopal episodes.  (Tr. 278.)  His dizziness continued in September.  (Tr. 276-77.)  Dr. Steven Gilles opined that the cause was likely medication related or anxiety.  (Tr. 277.)

### C.  Hearing Before the ALJ

Plaintiff testified at the hearing before the ALJ on November 4, 2007.  (Tr. 434-54.)  He testified that he lived in a mobile home with his mother and his twelve-year-old son.  (Tr. 435.) He last worked painting gutters as a subcontractor in December 2004.  (Tr. 437.)  For a number of years, he was paid in cash for doing odd jobs.  (Tr. 438-39.)  He did mostly heavy work including climbing, bending, shoveling, and scraping.  (Tr. 440.)

Plaintiff testified that he was spending twenty hours a day in bed.  (Tr. 441.)  He could do some housework, either with assistance from his son or by doing it in shifts, resting in between. (Id.)  Plaintiff testified that before his onset date, he was working even though he had eight to ten ruptured disks in his back.  (Tr. 443.)  After he fell on some ice in December 2004, he could barely walk.  (Id.)  He has not been able to return to work after two years of trying to recuperate from back surgery.  (Tr. 444.)  He has constant back pain with flares of greater pain.  (Tr. 445.)

Plaintiff testified that he was not going to physical therapy because changes in his medication were causing him dizziness.  (Tr. 447-48.)  He testified that he can stand for twenty minutes, sit for fifteen to thirty minutes, and stay out of bed a couple of hours.  (Tr. 448-49.)  Plaintiff testified that he can not kneel down, bend over, stand up from being on his knees, or bend at the waist without extreme pain.  (Tr. 453.)  He had difficulty showering, and had to rest in bed after taking a shower.  (Tr. 453-54.)

David Russell then testified as a vocational expert. ("VE").  (Tr. 455.)  The ALJ asked the VE whether a person who could lift ten pounds, stand two hours, and sit six hours could perform Plaintiff's past relevant work.  (Id.)  Mr. Russell responded in the negative, but testified that such a person could perform other work such as bench level production, assembly, cashier, hand trimmer, and hand painter.  (Tr. 455-56.)  He further testified that there would be 5,000 such assembly jobs in Minnesota and 5,000 cashier jobs.  (Tr. 456.)  The second hypothetical question assumed the individual to be of Plaintiff's age, education, work history, able to do sedentary, unskilled work, who would be absent more than three days a month.  The VE testified such a person could not be competitively employed.  (Id.)

> ### D.    The ALJ's Decision

At the first step of the disability evaluation process, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the application date.  (Tr. 17.)  At the second step of the evaluation, the ALJ found that Plaintiff has severe impairments of lumbar radiculopathy associated with degenerative disk disease, status post decompression and fusion in 2005, benign hypertension, major depressive disorder, and pain disorder.  (Id.)  He found Plaintiff's glucose intolerance, hives, and psoriasis to be non severe.  (Id.)  The ALJ concluded that Plaintiff does

not have a physical or mental impairment that meets or medically equals any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)  In analyzing Plaintiff's mental impairments, the ALJ concluded that Plaintiff had mild restrictions in activities of daily living, mild difficulties in social functioning, and moderate difficulties in concentration, persistence or pace, and no episodes of decompensation.  (Tr. 18.)

At step four of the evaluation, the ALJ found Plaintiff to have the residual functional capacity to perform sedentary work, generally described as lifting and carrying ten pounds occasionally and frequently, standing and/or walking two hours of an eight hour day, sitting six hours of an eight hour day, and limited to low stress work.  (Tr. 19.)  The ALJ concluded that the claimant could not perform his past relevant work.  (Tr. 23.)  However, the ALJ concluded that the claimant could perform other jobs that exist in significant numbers in the national economy.  (Tr. 24.)  Thus, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act.  (Tr. 25.)

## III.    STANDARD OF REVIEW

Judicial review of defendant's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1994).  Substantial evidence is enough evidence that a reasonable person might accept as adequate to support a conclusion.  Dixon v. Barnhart, 353 F.3d 602, 604 (8th Cir. 2003).  Where such evidence exists, a court is required to affirm defendant's factual findings.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  On the other hand, the analysis must include evidence in the record which detracts from the weight of the evidence supporting the ALJ's decision.  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).

Thus, the court must consider the weight of the evidence in the record and apply a balancing test to evidence which is contrary.  Id.

IV.    **DISCUSSION**

Plaintiff alleges several errors in the ALJ's decision.  The issues, in order of the five-step disability evaluation process, are as follows.  First, whether the ALJ failed to consider all of Plaintiff's disabling impairments in combination at step two of the disability process.  Second, whether the ALJ erred in finding that Plaintiff does not meet or equal Listing 12.04.  Third, whether the ALJ erred in determining Plaintiff's residual functional capacity by failing to give adequate weight to the treating physicians' opinions, and failing to find Plaintiff fully credible.  Finally, whether the ALJ's decision is unsupported by substantial evidence because the ALJ failed to include all of Plaintiff's limitations in the hypothetical question posed to the vocational expert.

A.    **Severe Impairments**

At step two of the disability evaluation process, the claimant must prove that she has a severe impairment that significantly limits her physical or mental ability to do basic work activities.  Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996).  If the claimant fails to make the showing, the analysis ends, but if the claimant succeeds, the analysis continues to the next step.  Id.

Plaintiff alleges the ALJ failed to consider whether his conditions of allergic uritcaria and diabetes are severe impairments, but Plaintiff has not described how these conditions limit his ability to do basic work activity, whether considered alone, or in combination with other impairments.  Although these conditions are mentioned in the medical record, they do not appear

to have affected Plaintiff's physical or mental abilities in any significant manner.  Thus,

Plaintiff's argument fails.

Plaintiff also argues the ALJ failed to consider back pain, dizziness and giddiness as

severe impairments.  Social Security Ruling ("SSR") 96-3p states that a claimant must have a

medically determinable impairment in order meet the second step of the evaluation process.  61

FR 34468-01, 1996 WL 362204 (F.R.)   It provides in relevant part:

> Because a determination whether an impairment(s) is severe
> requires an assessment of the functionally limiting effects of an
> impairment(s), symptom-related limitations and restrictions must
> be considered at this step of the sequential evaluation process,
> provided that the individual has a medically determinable
> impairment(s) that could reasonably be expected to produce the
> symptoms.

There is a difference between a medically determinable impairment and the symptoms

that the impairment produces.  See 20 C.F.R. § 404.1529(b) (symptoms will not be found to

affect a claimant's ability to do basic work activities unless medical signs or laboratory findings

show that a medically determinable impairment is present.)  An "impairment" must result from

anatomical, physiological, or psychological abnormalities that can be shown by medically

acceptable clinical and laboratory diagnostic techniques.  SSR 96-4, 61 FR 34488-01, 1996 WL

362210 (F.R.)

Dizziness, giddiness, and pain are symptoms, not medically determinable impairments.

The record does not contain a diagnosis of a medically determinable impairment that caused

Plaintiff's dizziness and giddiness.  Dr. Gilles only speculated that these symptoms were caused

either by medication or anxiety.  (Tr. 277.)  The ALJ was not required to include dizziness and

giddiness as severe impairments.

14

Finally, the ALJ characterized Plaintiff's medically determinable physical impairment as lumbar radiculopathy associated with degenerative disc disease, status post decompression and fusion, and the ALJ continued the disability evaluation with the assumption that this impairment caused Plaintiff's back and leg pain.  The ALJ's failure to include spinal stenosis, spinal arthritis, or post laminectomy syndrome as severe impairments did not cause the ALJ to ignore Plaintiff's symptoms of back and leg pain, he attributed the symptoms to another impairment.  Remand is not necessary based on the ALJ's analysis at step two of the disability evaluation.

**B.    <u>Listing 12.04</u>**

Plaintiff contends his mental impairment of major depressive disorder meets the criteria of Listing 12.04 and establishes disability.  In support of this argument, Plaintiff cites his diagnosis of major depressive disorder, DSM-IV code 296.23, and GAF scores varying between 44-50 as indicators that he suffers severe symptoms affecting his functioning.  The fifth digit of DSM-IV code 296.23 indicates a diagnosis of "severe without psychotic features" and symptoms that markedly interfere with occupational functioning or usual social activities or relationships with others.  DSM-IV-TR at 413.  Plaintiff further alleges his physical impairments and psychological impairments combined meet or equal the Listing, and the ALJ failed to consider his impairments in combination.

The listing of impairments in 20 C.F.R. § 404, Subpt. P., Appendix 1 describes, for each of the major body systems, impairments that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his age, education or work experience.  20 C.F.R. § 404.1525(a).  An impairment can not meet the criteria of a Listing based only on a diagnosis, the claimant must have an impairment that

satisfies all of the criteria of the Listing.  20 C.F.R. § 404.1525(d); see also Randolph v.

Barnhart, 386 F.3d 835, 840-41 (8th Cir. 2004) (comparing Listing criteria to DSM-IV criteria).

To meet Listing 12.04 for affective disorders, a claimant must show that she has certain

depressive symptoms resulting in at least two of the following: marked restrictions of activities

of daily living; marked difficulties in maintaining social functioning; marked difficulties in

maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of

extended duration.  20 C.F.R. § 404, Subpt. P, App. 1, § 12.04.   An impairment or impairments

that do not meet the criteria of a Listing can medically equal the criteria and establish disability.

20 C.F.R. §§ 404.1525(c)(5), 404.1526(b)(3).

The ALJ found that Plaintiff's "mental impairments, considered singly and in

combination, do not meet or medically equal the criteria of listings 12.04 or 12.07."[2]  (Tr. 18.)

Specifically, the ALJ found that Plaintiff did not meet the "paragraph B criteria" of these listings

because his mental impairments did not result in marked restrictions of daily activities, social

functioning, maintaining concentration, persistence or pace, or repeated episodes of

decompensation, each of extended duration.  (Id.)  Furthermore, the ALJ noted that Plaintiff only

recently began mental health treatment.  An ALJ can discount a mental health treatment

provider's opinion when the claimant did not allege a disabling mental impairment in her

disability application, and had never previously sought mental health treatment.  Smith v.

Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993).

In finding that Plaintiff suffered mild restrictions in activities of daily living, the ALJ

noted Plaintiff lives with his mother and son in a mobile home and engages in independent

---

[2]  Listing 12.07 provides the criteria for disability based on somatoform disorders.

personal care and a wide range of household activities, pacing himself throughout the day.  (Id.)
With respect to social functioning, the ALJ found the claimant to have mild restrictions because
he is well supported by his mother and son, but his social activities are limited by financial
reasons.  (Id.)  The ALJ found Plaintiff to have moderate difficulties in concentration,
persistence or pace, noting that he is subject to a number of psychosocial stressors, but "remains
well-organized around his physical health," and was adequately motivated and worked
confidently during psychological testing in 2006, with a well organized and effective problem
solving approach.  (Id.)  The ALJ found no episodes of decompensation in the record, and no
evidence that Plaintiff met the "C criteria" of the listing.

Plaintiff bases his argument that he meets the criteria of Listing 12.04 solely on the
diagnoses and GAF score assessments of Drs. Smith and McCoy.  An impairment can not meet a
Listing based on a diagnosis alone.  20 C.F.R. § 404.1525(d).  GAF scores may be relevant
evidence, but they can be discounted if inconsistent with other evidence in the record.  England
v. Astrue, 490 F.3d 1017, 1023 n.8 (8th Cir. 2007) (citing Hudson ex rel Jones v. Barnhart, 345
F.3d 661, 666 (8th Cir. 2003).  The Court does not find evidence in the record to support the
GAF score assessments in the 40s by Drs. Smith and McCoy.  The severity of symptoms
diagnosed by Dr. Smith are considered in light of his comment that "[a]t some level, [Plaintiff's]
difficulties appear to be artifacts of his choices and personality organization [rather] than a
biological condition."  Disability under the social security regulations, however, must be based
on a medically determinable impairment.

Dr. McCoy noted Plaintiff's main stressor was dealing with his son, and he also appeared
to have some discomfort from his back, dysphoric mood, and sad affect.  (Tr.  330-32.)  Based

on Dr. McCoy's evaluation, it is not clear why he assessed a GAF score of 45-50, indicating serious symptoms.

Plaintiff underwent psychological tests administered by Dr. Folie.  The results of those tests indicate no more than moderate limitations in social functioning, and maintaining concentration, persistence and pace.  Thus, Dr. Folie assigned a GAF score of 55.  (Tr. 418.) This is consistent with Plaintiff's actual functioning in daily life as described by the ALJ. Therefore, the Court does not find substantial evidence in the record that Plaintiff suffers marked limitations in any of the four functional categories in the paragraph B criteria of Listing 12.04.

Plaintiff contends the ALJ failed to consider his physical and mental impairments in combination.  The ALJ stated, "the claimant's *mental* impairments, considered singly and in combination, do not meet or medically equal the criteria . . ." and "the claimant's *mental* impairments do not cause at least two "marked limitations . . ."  (Tr. 18) (emphasis added.) Although this might suggest the ALJ did not consider Plaintiff's physical and mental impairments in combination, it is difficult to imagine how the ALJ could have separated the effects of Plaintiff's physical and mental impairments on his functioning.  For instance, the ALJ concluded that Plaintiff's daily activities were only mildly impaired.  Apart from the few months before and after his surgery in May 2005, Plaintiff was able to independently care for himself and his son, grocery shop, increase his physical activities, and take himself and his son to medical appointments.  (Tr. 165, 169, 250, 337, 356, 258, 361, 386-87, 412.)  Similarly, Plaintiff could function well enough socially to arrange for and attend many appointments for himself and his son.  Plaintiff did these things despite his physical and mental impairments.  Although Plaintiff's ability to function socially and in daily activities might better be characterized by

moderate impairment, the record does not reflect marked impairment, as is required to meet or equal the Listing.  Considering the record as a whole, substantial evidence supports the ALJ's finding that Plaintiff did not meet or medically equal Listing 12.04 when all of his impairments were considered in combination.  See Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001) (affirming ALJ's decision where opinion writing technique was arguably deficient but substantial evidence supported ALJ's conclusion).

> ### C.    Residual Functional Capacity

"The RFC is a function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence."  Casey v. Astrue, 503 F.3d 687, 696-97 (8th Cir. 2007) (quoting Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004)) (additional citations omitted).  RFC is "the most [a claimant] can still do despite" his or her "physical or mental limitations."  Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004) (quoting 20 C.F.R. § 404.1545(a)).  In determining RFC, "the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional."  Id. at 738 (citing 20 C.F.R. § 404.1545(c); Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)). The ALJ must evaluate evidence in the record of the various physicians' opinions and the credibility of Plaintiff's subjective complaints.  See Id. (evaluating ALJ's RFC determination).

> ### 1.    Treating Physicians' Opinions

Plaintiff contends the ALJ failed to give appropriate weight to the opinions of his treating psychologist, Dr. Smith, and his treating psychiatrist, Dr. McCoy.  Plaintiff argues that Dr. Smith's diagnosis of major depressive disorder, with a DSM-IV code of 296.23, by definition indicates that Plaintiff's depressive symptoms "markedly interfere with occupational functioning

or with usual social activities or relationships with others." (Plaintiff's Brief at 11, quoting

DSM-IV at 413.) Similarly, Plaintiff notes that Dr. McCoy assigned Plaintiff a GAF score of 45-

50 and Dr. Smith assigned GAF scores of 44 and 46, indicating serious impairment in social,

occupational, or school functioning. Additionally, Plaintiff argues that his treating doctors and

physical therapists have imposed a number of restrictions over time, which were ignored by the

ALJ. Plaintiff contends the ALJ erred by relying on a medical consultant's opinion because the

consultant did not consider hundreds of pages of medical evidence and did not consider

Plaintiff's testimony. (Plaintiff's Brief at 14.)

A treating physician's opinion is typically entitled to controlling weight if it is well-

supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not

inconsistent with other substantial evidence" Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir.

2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000)). Even if a treating

physician's opinion is entitled to great weight, it does not obviate the court's need to evaluate the

record as a whole. Leckenby, 487 F.3d at 632 (citations omitted). The ALJ may reject the

opinion of any medical expert, whether hired by the claimant or the government, if the opinion is

inconsistent with the record as a whole. Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

The ALJ reviewed Drs. Smith and McCoy's evaluations and treatment of Plaintiff (Tr.

23), and as described in the above Section IV.B., the record as a whole is inconsistent with the

severity of symptoms suggested by Drs. Smith and McCoy. (Tr. 23.) With respect to other

treating physicians, the ALJ reviewed the medical evidence in the record in significant detail.

(Tr. 20-23.) He noted a number of instances where medical providers expressed concerns over

Plaintiff's chronic use of narcotic pain medication. (Tr. 20-22.) See Anderson v. Barnhart, 344

F.3d 809, 815 (affirming ALJ where evidence supported concerns over claimant's overuse of

narcotic pain medication).  The ALJ summarized his consideration of Plaintiff's RFC as follows:

> [i]n reaching the above conclusions as to the claimant's residual
> functional capacity, the undersigned has considered all medical
> opinions.  The claimant received extensive conservative care for
> low back pain prior to surgical repair in May 2005.  The claimant
> experienced good resolution of radicular symptoms.  The claimant
> reported a gradual return of symptoms; however, he had good
> positioning of his hardware and evidence of developing fusion and
> no persistent neurologic deficits.  There are no opinions regarding
> disability.  The undersigned reduced the residual functional
> capacity to a sedentary level in light of the claimant's testimony
> regarding overall functioning.  However, the undersigned did not
> offer additional allowances for changes of position as his
> neurologic deficits are not well supported in the record.   In
> addition, there is no objective support for his prolonged time spent
> in bed.  By his own testimony, he does not find relief of symptoms
> while lying down.  The claimant's blood pressure came under
> improved control with no significant functional limitations.  The
> claimant recently began mental health treatment for reported
> depression and anxiety in the context of pain and psychosocial
> stressors.  In light of the brief period of treatment, there are no
> opinions regarding Plaintiff's overall functioning.  The claimant
> remains fairly functional with a wide range of household chores
> and primary care for his son.  The undersigned placed appropriate
> consideration on the non-examining opinions of state examiners as
> a reasonable analysis of the record at that time but finds that the
> weight of the current record supports the finding herein.

(Tr. 23.)

The ALJ did not exclusively rely upon the non-examining medical consultant's physical

residual functional capacity analysis, but Dr. Aaron's RFC assessment nearly matches that of the

ALJ.  (Tr. 146-53.)  The only additional limitation added by the ALJ was low stress work.  The

ALJ must resolve a conflict between a one-time medical consultant's opinion and the opinion of

a treating physician.  Wagner, 499 F.3d at 849.  However, none of Plaintiff's treating physicians

assigned any functional restrictions other than avoiding snow shoveling.  (Tr. 362.)  Thus, the

ALJ's RFC finding is not inconsistent with the opinion of any treating physician.  Furthermore, "[i]t is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment."  Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (quoting Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004).  This is what the ALJ did.

The issue remains that Plaintiff reported greater functional limitations on sitting, standing, and walking than the ALJ accepted as true.  None of Plaintiff's treatment providers questioned his self-report of functional limitations, although they generally recommended that he engage in more activity.  Evidence of pain is subjective in nature, and "it is for the ALJ in the first instance to evaluate the credibility to be accorded a claimant's subjective complaints of pain."  Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir. 1991).  The Court must address whether the ALJ erred in his credibility analysis of Plaintiff's subjective complaints.

## 2.    Credibility Analysis

First, Plaintiff contends the ALJ's finding that Plaintiff was not entirely credible contradicted the ALJ's comment that Plaintiff was a fairly reliable historian.  Second, Plaintiff argues the ALJ failed to consider evidence related to diffuse spinal arthritis, persistent myofascial pain, low back pain, post laminectomy syndrome, and lumbar spinal stenosis.  Third, Plaintiff contends the ALJ did not consider much of the information in the physical therapy records.  Fourth, Plaintiff contends his testimony is consistent with doctor and therapy notes.

Defendant responds that no medical opinion supports Plaintiff's testimony that he must spend up to twenty hours a day in bed.  Defendant also points out that Plaintiff testified he can not put his own socks on his feet, but a notation in the medical record indicates that Plaintiff

could don his socks unassisted most of the time.  Defendant contends the ALJ appropriately

accommodated Plaintiff's impairments by reducing him to low stress sedentary work.

The ALJ must consider several factors when evaluating a claimant's subjective

complaints of pain, including claimant's prior work record, observations by third parties, and

observations of treating and examining physicians relating to 1) the claimant's daily activities; 2)

the duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) dosage,

effectiveness and side effects of medication; and 5) functional restrictions.  Casey, 503 F.3d at

695 (8th Cir. 2007) (citing Polaski v. Heckler, 729 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ

may discount subjective complaints when they are inconsistent with the evidence as a whole.  Id.

(citing Polaski, 739 F.2d at 1322).   "The ALJ is not required to discuss each Polaski factor as

long as the analytical framework is recognized and considered."  Tucker v. Barnhart, 363 F.3d

781, 783 (8th Cir. 2004).

Addressing Plaintiff's arguments in order, the ALJ's statement that Plaintiff was a fairly

reliable historian is not contradictory to the ALJ's credibility analysis.  The ALJ recognized that

Plaintiff had significant back surgery with residual pain, and agreed that Plaintiff's pain

prevented him from doing anything greater than sedentary low stress work, despite his work

history of heavy labor.

Second, the ALJ's failure to include spinal arthritis, persistent myofascial pain, low back

pain, post laminectomy syndrome, and lumbar spinal stenosis among Plaintiff's severe

impairments has been addressed in the above Section IV.A.  In summary, the ALJ did not fail to

consider Plaintiff's symptoms of back and leg pain, he attributed these symptoms to the

impairments of lumbar radiculopathy associated with degenerative disk disease, and pain

disorder.  Plaintiff has not explained how attributing his pain to a different diagnosis would change the outcome in this case.

Plaintiff's third argument is that the ALJ did not consider much of the physical therapy records.  The ALJ considered records from Plaintiff's physical therapy.  He noted that when Plaintiff began physical therapy in July 2005, he fatigued easily, and had decreased flexibility in the hips and lower extremities.  (Tr. 21.)  The ALJ also noted that Plaintiff discontinued therapy based on worsening pain.  (Id.)  The ALJ commented on Plaintiff's return to physical therapy in March 2006, after a six week absence, and that Plaintiff reported ongoing back pain and tingling in the legs, and ongoing difficulties with activities of daily living.  (Tr. 22, 226.)  The ALJ also noted that Plaintiff reported improved control with the trunk stabilizing musculature, and the ability to walk up to one half mile.  (Id.)  Plaintiff was informed he needed consistent attendance in therapy to make progress.  (Id.)  The Court also notes that the record indicates Drs. Leisz and Freese encouraged Plaintiff to be more active, and when he was more active and showed some improvement, Dr. Leisz encouraged him to look for sedentary work.  (Tr. 166, 362, 387.)  This evidence, and evidence that Plaintiff did not consistently engage in physical therapy, although improvement was noted when he did attend, is inconsistent with Plaintiff's allegation of disabling pain.  See Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (affirming ALJ's credibility analysis, among other reasons, because claimant cancelled several physical therapy appointments.)

Plaintiff's fourth argument is that his subjective complaints are consistent with medical records and physical therapy notes.  The ALJ concluded that Plaintiff's allegations of disabling pain and incapacitating limitations are not consistent with the objective medical record.  (Tr. 20.)

The ALJ's primary support for this contention was that Plaintiff's condition improved after surgery in May 2005, with complete resolution of leg pain shortly after surgery, evidence that there were  no neurological deficits to explain the leg pain returning, and a solid fusion.  (Tr. 21, 22.)   While substantial evidence supports this conclusion, the ALJ cannot discount Plaintiff's subjective complaints solely based on the lack of objective findings.  Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005).

The ALJ also considered Plaintiff's improvement with pain medication.  The ALJ noted that Plaintiff returned to physical therapy in September 2006, after a three month absence, and reported improved pain control with medication.  (Tr. 22.)  There is other evidence in the record that medication helped relieve Plaintiff's pain.  In January 2006, Plaintiff reported that Percocet and Lidoderm patches were improving his pain.  (Tr. 361.)   In June 2006, Plaintiff stated that an increase in medication improved his pain 30%.  (Tr. 388.)  As noted earlier, there is evidence of physicians' concerns about Plaintiff's chronic use of narcotic pain medication, which is one factor that negatively affects credibility.  Although Plaintiff had some dizziness associated with changes in his medication, the record does not indicate that this was a chronic side effect of Plaintiff's medication.  In summary, the overall evidence in the record of Plaintiff's back problems, and improvements after surgery and with treatment, supports the ALJ's finding that Plaintiff is limited to sedentary low stress work, but is not totally disabled.

D.    **Hypothetical Question**

Plaintiff argues the ALJ's failure to correctly state Plaintiff's residual functional capacity by not including such limitations as being limited to lifting five pounds and sitting for only thirty minutes, resulted in the ALJ posing an incomplete or flawed hypothetical question to the

vocational expert.  An ALJ need only include in the hypothetical question to the vocational

expert all of a claimant's impairments that are supported by substantial evidence, and functional

limitations that the ALJ accepted as true.  Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir.

2005).  When a vocational expert testifies based on a proper hypothetical question, the expert's

testimony constitutes substantial evidence upon which the ALJ can rely in making the disability

determination.  Id.  The ALJ found that Plaintiff could lift and carry ten pounds and sit for six

hours in an eight hour day, and the hypothetical question included these limitations.  The ALJ

properly relied on the vocational expert's testimony that there are a significant number of jobs in

the economy which Plaintiff could perform because the ALJ's residual functional capacity

finding is supported by substantial evidence.

## V.    RECOMMENDATION

For the foregoing reasons, it is hereby recommended that:

1.  Plaintiff's Motion for Summary Judgment be denied [Docket Nos. 9-14];

2.  Defendant's Motion for Summary Judgment be granted [Docket No. 17].

DATED: March 26, 2009

*s/ Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by
filing with the Clerk of Court and serving on all parties, on or before **April 15, 2009,** written
objections which specifically identify the portions of the proposed findings or recommendations
to which objection is being made, and a brief in support thereof.  A party may respond to the
objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall
be limited to 3500 words.  A judge shall made a de novo determination of those portions to
which objection is made.  This Report and Recommendation does not constitute an order or
judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of
Appeals.